## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| ESMON V. JONES, )　　　　　　　　 | |
| 　　　　　　　　　　　　　 ) | |
| 　　　　　　**Petitioner,**　 ) | |
| **v.**　　　　　　　　　　 ) | **Case No. 14-CV-2046** |
| 　　　　　　　　　　　　　 ) | |
| KIM BUTLER[1], Warden,　 ) | |
| 　　　　　　　　　　　　　 ) | |
| 　　　　　　**Respondent.**　 ) | |

### OPINION

On March 17, 2014, this court received a Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody (#1) from Petitioner, Esmon V. Jones. Respondent, Kim Butler, Warden of Menard Correctional Facility, filed his Answer (#9) on July 15, 2014.  Petitioner filed his Response (#11) to the Answer on July 25, 2014.  Petitioner has also filed a Motion for Summary Judgment by Default (#3) and Motion to Request Counsel (#12). For the following reasons, Petitioner's Petition (#1) and motions (#3, 12) are DENIED.

BACKGROUND

Petitioner filed a Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody in Case No. 13-CV-2006 on January 14, 2013.  On August 30, 2013, U.S. District Court Judge Michael P. McCuskey entered an Opinion granting Respondent's motion to dismiss due to Petitioner having failed to completely exhaust all of his claims in state court.  Judge McCuskey dismissed the petition without prejudice, giving Petitioner leave to reinstate his petition within 60 days of the conclusion of his pending state court proceeding. Petitioner did just that when he filed this instant petition on March 17, 2014.

---

[1]Kim Butler has replaced Rick Harrington as Warden of the Menard Correctional Center. The clerk is instructed to substitute Kim Butler as Respondent in this case.

<u>Motion for Summary Judgment and Motion for Counsel</u>

Before addressing the claims made in Petitioner's petition, the court must first address Petitioner's Motion for Summary Judgment by Default (#3) and Motion to Request Counsel (#12). Petitioner filed his summary judgment motion on June 16, 2014. In his motion, Petitioner correctly notes that, on March 17, 2014, the court gave Respondent 60 days to respond to Petitioner's petition. As of June 16, 2014, Respondent had not responded. That next day, however, Respondent filed a Motion for Extension of Time (#6) to file his answer, which the court granted, giving Respondent until July 17, 2014, to file his answer. The Answer (#9) was timely filed on July 15.

The court denies Petitioner's Motion for Summary Judgment by Default (#3). Petitioner is arguing that Respondent's failure to respond to his petition within the statutory time frame should result in judgment by default being granted in his favor. Petitioner's motion is denied on this ground, as the Seventh Circuit has held that "[r]eleasing a properly convicted prisoner or imposing on the state the costs and uncertainties of retrying him, perhaps many years after the offense, is apt to be a disproportionate sanction for the wrong of failing to file a timely motion for an extension of time[]" and that "[t]his thinking informs the principle that default judgment is disfavored in habeas corpus cases." *Lemons v. O'Sullivan*, 54 F.3d 357, 364 (7th Cir. 1995). Here, Petitioner filed a motion for extension of time, albeit a month late, and did eventually file an answer within the time allotted by the court. For that reason, and the reasons expressed by the Seventh Circuit in *Lemons*, Petitioner's Motion for Summary Judgment by Default (#3) is denied.

Petitioner has also filed a Motion to Request Counsel (#12). Petitioner argues that the interests of justice require counsel to be appointed because the prison has been on lockdown and

he has had limited access to the prison law library. The lockdown, Petitioner argues, has made it increasingly difficult for Petitioner "to properly converse with this court" and that appointed counsel could help him discover evidence he needs to advance his arguments concerning the state's withholding of evidence at trial. Petitioner further notes that he has no money to hire a lawyer.

The court finds that Petitioner's motion should be denied. In a habeas case, private counsel may be appointed for a financially eligible person whenever the court determines that the interests of justice so require. 18 U.S.C. § 3006A(a)(2)(B); *Johnson v. Chandler*, 487 F.3d 1037, 1038 (7th Cir. 2007). The decision on whether to appoint counsel is up to the sound discretion of the court in all but the most extraordinary of circumstances. *Winsett v. Washington*, 130 F.3d 269, 281 (7th Cir. 1997). "In exercising its discretion, the district court should consider the legal complexity of the case, the factual complexity of the case, and the petitioner's ability to investigate and present his claims, along with any other relevant factors." *Hoggard v. Purkett*, 29 F.3d 469, 471 (8th Cir. 1994). "Where the issues involved can be properly resolved on the basis of the state court record, a district court does not abuse its discretion in denying a request for court-appointed counsel." *Hoggard*, 29 F.3d at 471.

Here, having examined the issues presented by Petitioner and the state court record, the court believes the issues can be properly resolved on the basis of that record. Further, Plaintiff, through his multiple filings in this case, has demonstrated a thorough understanding of the issues in this case, which the court does not find to be legally or factually complex. While Petitioner argues that, at the current time his facility is frequently on lockdown, the nature of his petition and subsequent supporting briefs and motions demonstrate that Petitioner is able to satisfactorily investigate and present his claims. Petitioner's Motion to Request Counsel (#12) is denied.

<u>Factual Background</u>

The following facts are taken from the appellate court orders affirming Petitioner's

conviction on direct review (*People v. Jones*, No. 4-08-0555 (Ill. App. Ct. 2009)) and affirming

the denial of Petitioner's postconviction petition (*People v. Jones*, 2012 IL App (4th) 110281-U).

This court presumes the factual determinations made by the Illinois court of appeals in those

decisions to be true. 28 U.S.C. § 2254(e)(1); *Whitman v. Bartow*, 434 F.3d 968, 969 (7th Cir.

2006).

In August 2006 the State charged Petitioner and a co-defendant, Jerome Davis, with six

counts of first-degree murder in the August 4, 2006 shooting death of Calvin Fakes. The State

alleged the shooting was in retaliation for Fakes' theft of Petitioner's .22-caliber handgun earlier

in the day. Counts I through III alleged Petitioner personally discharged a firearm proximately

causing Fakes' death and sought a 25-year sentencing enhancement based upon that fact pursuant

to 720 ILCS 5/9-1(a)(1),(a)(2) (West 2004) and 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2004).

Counts IV through VI alleged the codefendants (Petitioner and Davis) discharged a firearm,

thereby causing decedent's death pursuant to 720 ILCS 5/9-1(a)(1), (a)(2) (West 2004). The trial

court severed Petitioner's and Davis' prosecutions before trial due to inconsistent claims and

defenses.

At Petitioner's January 2008 trial, the State introduced the following evidence. Jerome

Pelz testified his daughter woke him up at 1:47 a.m. on August 4, 2006, because the family dog

was barking. Pelz opened his front door and saw Fakes lying on the sidewalk. Fakes asked Pelz

for help because he had been shot in the left arm. Pelz's daughter called 911, and the police

arrived a few minutes later. Pelz testified Fakes told police a man named "J-Rock" had shot him.

An ambulance arrived a few minutes later and took Fakes to the hospital.

Decatur police officer Sean Bowsher testified that around 1:40 a.m. he responded to a shots-fired call in the 700 block of West Forest Avenue. A second call directed Officer Bowsher to the 500 block of South Crea Street, where Fakes was lying in the street. Officer Bowsher called for an ambulance and began questioning Fakes about the incident. Officer Bowsher testified Fakes stated a man named J-Rock shot him. Fakes confirmed J-Rock's given name was Jerome Davis. Fakes also told Officer Bowsher he was shot in the front of his home on the 500 block of South Siegel Street. After paramedics transported Fakes to the hospital for treatment, Officer Bowsher followed a blood trail back to the front steps of Fakes' home.

Decatur police officer Shawn Guenther testified he found Fakes around the same time as Officer Bowsher. Officer Guenther testified Fakes initially denied knowing the shooter but eventually told the officer J-Rock shot him. Fakes also told Officer Guenther J-Rock lived in an apartment complex on Decatur Street.

Decatur police officer Josh Sheets testified he conducted a felony stop on a car police believed Davis was riding in as it was leaving the apartment complex around 2 a.m. The car contained Petitioner, Davis, and Rhonda Reed, its owner and driver. All three were arrested.

Fakes died of his wounds around 6 a.m. on August 4, 2006. Dr. Travis Hindman testified he conducted Fakes' autopsy. Dr. Hindman concluded Fakes died from massive blood loss due to a gunshot wound to the left arm. Dr. Hindman based his conclusions upon the destroyed blood vessels in Fakes' left arm and photos showing substantial amounts of dried blood in the area where police found Fakes. According to Dr. Hindman's testimony, the bullet entered the outside of Fakes' left arm just above the elbow and exited the inside part of the arm. Dr. Hindman testified the shooter was over 1 ½ feet away from Fakes when he fired because the entrance wound lacked gunpowder residue, smoke residue, or tattooing.

The State introduced the following evidence regarding the events surrounding the shooting itself. Reed testified that she went to a small gathering at Jerome Davis and Vernice-Powell Hayes' apartment in a complex on the 700 block of West Decatur Street in the early evening of August 3, 2006. Reed estimated she arrived around 6 p.m. or 7 p.m. to celebrate Davis and Powell-Hayes' receipt of a marriage license. When Reed arrived, Fakes, Powell-Hayes, Davis, and Petitioner were all present. At some point in the evening, Reed drove her two daughters, E.S. and D.S., Petitioner, Fakes, and Davis over to Petitioner's mother's house. Fakes and Petitioner exited the car and walked into an alley next to Petitioner's mother's house while the others waited.

Reed waited for a few minutes and then drove around the block looking for Petitioner and Fakes. She was ready to leave when Fakes came running back to the car yelling "Go go go." Reed drove off, leaving Petitioner behind. Reed left E.S. and D.S. at their grandmother's home and went back to the party. After leaving the party again with Kizzy McNeal, Petitioner's girlfriend, to look for him, Reed returned to find Petitioner standing in the apartment complex parking lot holding a rifle and talking to Davis. Fakes had already left by the time Petitioner arrived. Petitioner was angry and muttering no one could steal from him.

Reed testified that, much later, she, Davis, and Petitioner decided to go to the liquor store to pick up more alcohol for the party. As they were leaving the parking lot, police pulled over Reed's car and arrested all three occupants. Reed admitted she drank steadily throughout the night.

E.S. testified Fakes returned to Reed's car carrying a black handgun. E.S. saw Fakes hand the gun to Davis, who put it in his waistband.

Powell-Hayes confirmed Reed's testimony she and Davis were having a party to celebrate

the receipt of their marriage license.  Powell-Hayes also confirmed that Petitioner, Fakes, Davis, and Reed's two daughters left during the party in Reed's car.  According to Powell-Hayes' testimony, Petitioner was very angry when he returned.  Powell-Hayes testified Petitioner left the party three times, once in Reed's car and twice on foot with Davis.  He brought the rifle on the final trip.  Petitioner left by climbing over a fence into an alley behind the parking lot.  Powell-Hayes testified Petitioner and Davis returned 20 to 25 minutes later.  Petitioner climbed over the fence and slid the gun under it.  According to Powell-Hayes' testimony, Petitioner stated "I shot twice, but I don't know if I hit him or not."

McNeal testified she was Petitioner's girlfriend and lived with him at the time of the shooting in the same apartment complex as Davis and Powell-Hayes.  According to McNeal's testimony, she saw Petitioner loading a rifle that night.  While loading it, he told her "[b]aby, I'm going back to prison."  Petitioner stated he was going to get his other gun back.  McNeal testified Petitioner left three times on foot and twice with the rifle.  When Petitioner returned the final time, he stated he did not know whether he had shot Fakes or not.  McNeal later returned to the apartment she shared with Petitioner and saw the rifle on the floor.  McNeal told Davis to move it, and he did so, hiding it below a garbage can near the apartment building.

McNeal testified everyone at the party, including Petitioner, seemed intoxicated.  McNeal was the only person not drinking alcohol at the party because at the time she was pregnant with Petitioner's child.

Toninette Bond testified she lived in the same apartment building as Petitioner.  Bond testified that late on August 3, she was coming down the stairs of her apartment building to join the party at Powell-Hayes' apartment when she saw Petitioner pointing a rifle in her direction.  When Bond reached the bottom of the stairs she heard McNeal say Petitioner shot someone.

According to Bond's testimony, Petitioner responded by stating "[h]e don't give a damn[.] [H]e'll do time."

Jerome Davis was the State's only witness to the shooting itself. Davis testified he had known Fakes for about four years at the time of the shooting and Fakes knew him as J-Rock. According to Davis' testimony, Petitioner became very angry after Fakes stole Petitioner's handgun. Davis and Petitioner went over to Fakes' house twice late in the evening to get Petitioner's gun back. Davis testified on their first trip, Fakes offered to pay for the gun, so he and Petitioner left.

Petitioner and Davis returned a second time to Fakes' home after Petitioner retrieved a loaded rifle from his apartment. Petitioner was carrying the rifle when they arrived at Fakes' home. Davis testified he accompanied Petitioner to keep the situation calm. Davis walked up to Fakes' door and knocked, while Petitioner waited on the grass in front of the home and to Davis' right. Fakes answered the door smoking a cigarette. He walked onto the porch and closed the door behind him. Davis asked for a drag of the cigarette. Davis testified that as Fakes was handing over the cigarette, Petitioner filed a shot. Davis ran off the porch back toward the apartment complex, while Fakes ran in the opposite direction. Petitioner was still four or five feet off the grass. Davis heard the second shot, but did not see it.

Davis admitted the State had charged him with first degree murder in Fakes' death. Davis also admitted drinking alcohol that night.

Sharonda Wright testified that she lived with Fakes at the time of his death. She heard Fakes come home between 12 and 1 a.m. Sometime later, she heard a knock at the door. She heard two voices she recognized but did not know the speakers' names. Wright then went downstairs to speak with Fakes, who was standing in the doorway talking to two black males.

Wright identified Petitioner as one of the men speaking with Fakes. Wright said something to Petitioner and went back upstairs. The two men then left. A few minutes later, Wright heard another knock on the door followed by two gunshots. Wright testified she then ran back downstairs to speak with arriving police and noticed blood on the porch.

Robert Maulding testified he saw two black men walk down the alley behind his home twice just before the shots. The alley led from the apartment complex toward Fakes' home. The second time Maulding saw the men, one was carrying a rifle. Maulding also heard one of them say he was "going to kill that motherfucker."

Doug Shoemaker testified he lives on the 700 block of West Forest Avenue, between Petitioner's apartment and Fakes' home. Around the time of the shooting, Shoemaker saw two black men pass by his house three times. Shoemaker testified the first time he saw them one of the men stated something like "that M. F'er wasn't going to diss [him]." According to Shoemaker's testimony, on the third trip, the man wearing a t-shirt was carrying what appeared to be a long stick. Other testimony established Davis was wearing a t-shirt and Petitioner was shirtless. Shoemaker testified the stick-like object could have been a rifle. Shortly thereafter, Shoemaker heard two gunshots and saw a black male running through his neighbor's backyard. Other testimony established police found Fakes' blood trail in the area where Shoemaker saw the unidentified man running. Shoemaker testified he then called the police, who arrived a few minutes later.

Officer Cody Moore testified he found a .22 caliber rifle underneath a garage can at Petitioner's apartment complex. Officer Scott Cline testified he searched Fakes' residence. Officer Cline recovered two live and one spent .22 caliber cartridge in Fakes' front yard and one bullet lodged in a windowsill of Fakes' home. Both Officer Cline and Decatur police officer

Randall Chaney testified they searched Petitioner's apartment and recovered live .22-caliber bullets in the living room and bedroom.

Caroline Kersting of the Illinois State Police Forensic Science Laboratory testified that Petitioner's rifle fired the spent .22-caliber cartridge found at the scene. Kersting could not exclude Petitioner's rifle as having fired the bullet found in Fakes' arm or the windowsill.

Petitioner testified on his own behalf. He admitted he owned two .22-caliber firearms, one rifle and one handgun. Petitioner explained that on the night of the shooting, he was sitting outside Davis' and Powell-Hayes' apartment drinking with Davis, Powell-Hayes, Reed, and Fakes. Reed's children were also present. Eventually, Petitioner decided to hide his .22-caliber handgun because he was "riding." Reed drove Petitioner, Fakes, Davis, and her two children to Petitioner's mother's house to hide the handgun. When Petitioner and Fakes went behind the house to hide the gun, Petitioner handed the gun to Fakes. Fakes then ran away, threatening to shoot Petitioner if he followed.

After waiting a few minutes, Petitioner walked back to the street, where he saw an acquaintance in a passing car who gave him a ride back to the party.

Petitioner denied shooting Fakes. He also denied loading the rifle in preparation for the second trip to Fakes' house, stating he had loaded it earlier in the day. However, Petitioner admitted going to Fakes' house with Davis twice to get his handgun back and bringing the rifle on the second trip. On the second trip, Petitioner testified he gave Davis the rifle and waited at the corner of Forest Street and Siegel Street while Davis went up to Fakes' house. Petitioner testified he could not see Fakes but heard the shots fired, at which point he ran back to the apartment complex with Davis.

At the jury-instruction conference, the trial court overruled defense counsel's objection to

the State's proposed accountability instruction. The instruction was based off of Illinois Pattern Jury Instructions, Criminal, Nos. 5.03, which defines accountability, and 5.06, which defines a defendant's responsibility for the acts of a third party where he or she was not prosecuted, not convicted, acquitted, or convicted of a different crime. Defense counsel objected on the grounds that both Davis and Petitioner testified the other acted alone in shooting Fakes, but the trial court overruled the objection, stating that there was "sufficient evidence of a plan to give the instruction.

In his closing argument, the State argued Petitioner shot Fakes with a rifle in the manner Davis testified. In the alternative, the State argued Petitioner was guilty under a theory of accountability because the evidence showed Petitioner and Davis shared a common plan to retrieve the gun from Fakes. Defense counsel argued Davis shot Fakes and the State had failed to introduce evidence showing Petitioner was legally responsible for Davis' conduct.

After defense counsel completed his closing argument, the following exchange occurred:

"THE COURT: Is the State ready to proceed with rebuttal?

MR. SPENCE [Assistant State's Attorney]: As soon as I'm finished choking, yes.

THE COURT: We all have it. Okay. You may proceed.

MR. SPENCE: Thank you. Ladies and gentlemen, it is not the objective of a defendant to aid you or assist you in any way in getting at the truth. In fact, the defendant's objective is to confuse you.

MR. MATTINGLY [defense counsel]: Objection, Judge. That is not the defendant's objective. It is not proper argument.

THE COURT: Sustained.

MR. SPENCE: It is not the defendant's objective to deliver you the truth.

MR. MATTINGLY: Again objection.

THE COURT: I'm going to sustain that, Mr. Spence."

The jury convicted Petitioner of first degree murder (720 ILCS 5/9-1(a) (West 2004)) but found the State did not prove beyond a reasonable doubt that Petitioner personally discharged a firearm during the commission of the offense (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2004)). After the conclusion of the trial, the State tendered to defense counsel a copy of Davis' 1999 conviction for reckless discharge of a firearm. Defense counsel did not challenge the State's assertion that it did not learn of the conviction until after Petitioner's trial.

Defense counsel filed a motion to vacate judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2006)). Defense counsel argued the State committed reversible error under *Brady v. Maryland*, 373 U.S. 83 (1963) when it inadvertently failed to disclose Davis' 1999 felony conviction for reckless discharge of a firearm. Petitioner argued, and the State conceded, that *Brady* required the State to disclose Davis' impeachable conviction to defense counsel before trial. The State argued the failure to disclose did not prejudice Petitioner because (1) other evidence established Petitioner's guilt beyond a reasonable doubt; (2) the jury found Petitioner did not personally discharge the firearm that killed Fakes; and (3) IPI Criminal No. 3.17 instructed the jury to view Davis' testimony with caution. The court denied Petitioner's motion for lack of prejudice to him.

On direct appeal, Petitioner argued: (1) that an accountability instruction should not have been given; (2) the State committed reversible error when it failed to disclose Davis' 1999 conviction for reckless discharge of a firearm until after trial; and (3) the State committed reversible error when it stated during rebuttal that it was not the objective of Petitioner to aid the

jury or assist it in any way in getting at the truth and that it was not Petitioner's objective to deliver to them the truth. The appellate court rejected Petitioner's arguments and affirmed his conviction. The same arguments were raised in Petitioner's direct appeal PLA to the Illinois Supreme Court, except here the Petitioner's PLA counsel included, as improper, the State's opening rebuttal remark of "as soon as I'm finished choking." The Illinois Supreme Court denied Petitioner's PLA.

Petitioner filed a postconviction petition on December 27, 2010. The petition raised the issues of the *Brady* violation and prosecutorial misconduct and ineffective assistance of trial counsel. The trial court dismissed the petition as frivolous and patently without merit. The appellate court affirmed the dismissal and the Illinois Supreme Court denied Petitioner's PLA. Petitioner filed this Petition (#1) on March 17, 2014, and Respondent filed his Answer (#9) on July 25, 2014. Petitioner has filed supplemental filings and a Reply. The case is now fully briefed. Respondent has conceded there are no timeliness issues and the court will address Petitioner's claims on the merits.

ANALYSIS

Petitioner raises two grounds for habeas relief in his petition. Petitioner's first ground is the *Brady* violation. Petitioner contends that, because the State failed to disclose that Davis had a prior felony gun conviction before trial, his constitutional rights were violated and he was prejudiced. Petitioner's second ground is that he was denied a fair trial due to the statements made by the prosecutor in the State's rebuttal closing argument. Respondent rejects both of Petitioner's grounds for relief.

*Brady Violation*

Petitioner argues that the state courts erred in focusing on the "impeaching" aspect of his

*Brady* claim, and that they should have focused on the "exculpatory" aspect, because the prior conviction would have shown that Davis was untruthful and the jury should not believe his testimony that Petitioner shot Fakes. Petitioner believes that if the jury had known Davis was a convicted felon, it might have believed that, not only was Davis the shooter, but that Davis acted alone and not in concert with Petitioner. Petitioner argues that a "reasonable probability" existed that jury would have acquitted Petitioner of murder under the accountability theory if they had known Davis was a convicted felon. Further, Petitioner argues that any "impeachment" of Davis during trial was worthless, because defense counsel tried to impeach Davis with a false conviction disclosed by the State before trial. Davis denied the conviction, leaving the jury with the impression that Davis had no criminal record and casting culpability on Petitioner.

The state appellate court adjudicated Petitioner's argument on the merits. "Where a state court adjudicated the petitioner's claim on the merits, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prohibits a federal court from granting habeas relief unless the state-court adjudication 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence' before the state court." *Newman v. Harrington*, 726 F.3d 921, 927 (7th Cir. 2013), quoting 28 U.S.C. § 2254(d)(1)-(2). A federal court's review of the state court decision under AEDPA is limited to the record before the state court. *Newman*, 726 F.3d at 927. Federal courts reviewing habeas cases, generally, are limited to deferential review of the reasonableness, rather than the absolute correctness, of a state court decision. *Newman*, 726 F.3d at 927. The court presumes the state court factual findings to be correct, unless the petitioner rebuts the presumption by clear and convincing evidence. *Morgan v. Hardy*, 662 F.3d 790, 797 (7th Cir.

2011). This "presumption of correctness also applies to factual findings made by a state court of review based on the trial record." *Morgan*, 662 F.3d at 798.

"Under the 'contrary to' clause, a federal court may issue a writ of habeas corpus if the state court applied a rule that 'contradicts the governing law' set forth by the Supreme Court or if the state court reached a different outcome based on facts 'materially indistinguishable' from those previously before the Supreme Court." *Morgan*, 662 F.3d at 797, quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

"Under § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.' [citation omitted] 'A state court decision is an 'unreasonable application of ... clearly established Federal law' when the court applied Supreme Court precedent in 'an objectively unreasonable manner.'' [citation omitted] A 'state prisoner must show that the state court's ruling on the claim ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.' [citation omitted] Under § 2254(d)(1), 'we presume that the courts' factual determinations are correct unless [the petitioner] rebuts the presumption by clear and convincing evidence. [citation omitted] This standard is demanding, but not insurmountable. [citation omitted] As for § 2254(d)(2), federal courts conclude that a state court decision was based on an unreasonable determination of the facts 'if it rests upon factfinding that ignores the clear and convincing weight of the evidence.' [citation omitted]" *Newman*, 726 F.3d at 927-28 (emphasis in original).

Petitioner must establish two things to prevail on his *Brady* claim: (1) he must show that the government failed to give him evidence favorable to his defense, that would tend to show his innocence, or that could be used to impeach a witness at trial; and (2) he must show that the evidence suppressed was material, in that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Morgan*, 662 F.3d at 800.

Addressing the first *Brady* element, we agree with Petitioner and the Illinois appellate court, and Respondent concedes, that the State's failure to supply the defense with information about Davis' prior conviction during Petitioner's trial deprived Petitioner of impeachment material. See *Morgan*, 662 F.3d at 800. The court now turns to the whether the suppressed evidence was material.

First, the court must determine whether the Illinois appellate court's decision was "contrary to" or involved an "unreasonable application of" federal law as determined by the U.S. Supreme Court. 28 U.S.C. § 2254(d)(1). Here, the Illinois appellate court quoted the Illinois Supreme Court's decision in *People v. Beaman*, 890 N.E.2d 500 (Ill. 2008), to define evidence as being material "where a reasonable probability arises that the outcome of the defendant's trial would have been different had the prosecution disclosed it." *Beaman*, 890 N.E.2d at 510. *Beaman* in turn was citing from the earlier Illinois Supreme Court decision in *People v. Harris*, 794 N.E.2d 181, 193 (Ill. 2002). *Harris* was citing from the U.S. Supreme Court decision in *Kyles v. Whitley*, 514 U.S. 419 (1995), which held that "[a] 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434, quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985). Thus, the rule applied by the Illinois court did not contradict the

governing law, nor has Petitioner pointed to a U.S. Supreme Court case with facts indistinguishable from this one that reached a contrary result and, therefore, the "contrary to" clause is satisfied.  See *Morgan*, 662 F.3d at 797.

Under the "unreasonable application" clause of § 2254(d)(1), the court's review is limited to whether the Illinois court extended a rule to an inapplicable context or refused to extend a rule to an applicable context.  See *Morgan*, 662 F.3d at 801-02.  Neither of those situations is present here.  After making the threshold determination that *Brady* was violated by nondisclosure, the court went on to address *Brady*'s second prong- whether the suppressed evidence was material. Here, the Illinois appellate court concluded that the failure to disclose Davis' conviction did not undermine their confidence in the outcome of Petitioner's trial.  The court found the evidence of Petitioner's guilt to be very strong and supported by multiple witnesses, not just Davis' testimony.  The court found the evidence strong that Petitioner shot Fakes, and speculated that the jury exercised its traditional power of lenity in failing to convict Petitioner of personally firing the shots that killed Fakes.  Further, the appellate court noted that the trial court gave an instruction to the jury to view Davis' testimony with caution and noted that an accomplice's testimony is to be viewed with "suspicion" and should be carefully examined in light of other evidence.  Further, the court noted that Davis was impeached by defense counsel with prior inconsistent statements and Davis' intoxication.  The appellate court, "based upon the strong evidence of [Petitioner's] guilt, the cautionary language of [the jury instruction], and defense counsel's impeachment of Davis in other ways," found that Petitioner failed to show the outcome of his trial would have been different had defense counsel impeached Davis with a nine-year old felony conviction.  This court will not disturb the Illinois appellate court's reasonable application of *Brady*.  See *Morgan*, 662 F.3d at 802.

Next, on habeas review, Petitioner, essentially, must show that the Illinois appellate court's determination of the facts was unreasonable, "'that is, lying well outside the bounds of permissible differences of opinion.'" *Morgan*, 662 F.3d at 800-01, quoting *Toliver v. McCaughtry*, 539 F.3d 766, 774 (7th Cir. 2008). "Under § 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon factfinding that ignores the clear and convincing weight of the evidence." *Morgan*, 662 F.3d at 801. Applying this deferential standard of review, the Illinois appellate court did not violate § 2254(d)(2) when it found that there was no reasonable probability that disclosure of the suppressed evidence would have led to a different result. See *Morgan*, 662 F.3d at 801.

As noted above, the Illinois appellate court concluded that the failure to disclose Davis' conviction did not undermine its confidence in the outcome of the trial and found the evidence of Petitioner's guilt to be very strong and supported by the testimony of multiple witnesses besides Davis. Further, the court noted that the State's main purpose in having Davis testify was to prove Petitioner shot Fakes, a proposition at least some jury members of the jury appear to have rejected. The court also noted that the jury may have exercised its traditional lenity power in failing to convict Petitioner of personally firing the shot that killed Fakes, despite "[t]he overwhelming weight of the evidence [that] suggested [Petitioner] shot Fakes."

The appellate court then supported its determination by citing to the testimony of multiple witnesses suggesting Petitioner's direct involvement. Davis testified Petitioner shot Fakes. Powell-Hayes testified Petitioner admitted he "shot twice," while McNeal stated Petitioner told her he was "going back to prison." According to Bond's testimony, Petitioner stated he would "do his time." All the people present at the apartment party admitted Petitioner was very angry when Fakes took his gun and testified that Davis tried to calm Petitioner throughout the night. In

contrast, as revealed by the testimony, Davis had no motive to shoot Fakes and no witness described him as angry or upset.

The appellate court also discussed the physical evidence that supported the State's theory that Petitioner was the shooter. Fakes' entrance wound was on his left arm and Dr. Hindman testified that whoever shot Fakes was standing more than 1 and ½ feet away because his wounds had no gunpowder residue, smoke residue, or tattooing around them. Both Petitioner and Davis testified they walked up to the front porch to speak with Fakes, while Petitioner waited some distance away. The appellate court found the evidence showed Petitioner was standing some distance from Fakes and to his left, exactly where the shot came from, but in contrast the evidence showed Davis was standing directly in front of Fakes no more than a few feet away. The court noted that Petitioner claimed to be further away, waiting at a street corner, but Shoemaker testified he never saw Petitioner at that corner.

After considering the evidence cited above, and the impeachment of Davis by defense counsel on prior inconsistent statements and Davis' intoxication that evening, the appellate court concluded that Petitioner failed to show the outcome of his trial would have been different had defense counsel impeached Davis with a nine-year old felony conviction. The failure of the jury to find Petitioner personally discharged the gun shows that some of the jurors, at least, did not believe Davis to be credible in any matter and may have believed Fakes' declaration that Davis shot him, but the jury still believed the other witness testimony and physical evidence so as to convict Petitioner of murder under an accountability theory, which holds a person accountable for another's murder if the person has the mental state described by the murder statute, causes another person to commit the murder, and with the intent to promote or facilitate commission of the murder, solicits, aids, abets, agrees, or attempts to aid the other person in planning or

committing the offense. 720 ILCS 5/5-2(a), (c) (West 2012). The evidence as recited by the appellate court supports that jury verdict. This court does not agree with Petitioner that the Illinois appellate court engaged in an objectively unreasonable determination of the facts in concluding that the suppressed evidence was not material under *Brady*. See *Morgan*, 662 F.3d at 801. Petitioner's petition is denied on this ground.

*Prosecutor's Statements*

Petitioner's second and final ground for habeas relief is that the prosecutor's misconduct during the State's rebuttal argument at trial violated his right to due process of law. Specifically, Petitioner cites the following statements: (1) the prosecutor's statement, when asked by the court if he was ready to proceed after the defense closing argument, "as soon as I'm finished choking, yes"; (2) the prosecutor's statements that it was "not the objective of a defendant to aid you or assist you in any way in getting at the truth" and that Petitioner's "objective is to confuse you" and "[i]t is not the defendant's objective to deliver to you the truth." Respondent contends that the first cited statement, about choking, is procedurally defaulted and that the remaining statements did not constitute a due process violation.

The court will address all the statements on the merits. The U.S. Supreme Court case of *Darden v. Wainwright*, 477 U.S. 168 (1986) established a two-prong test for determining whether a prosecutor's comments in closing argument constitute a denial of due process. *Ellison v. Acevedo*, 593 F.3d 625, 635-36 (7th Cir. 2010).

> "The court must first look to the challenged comments to determine whether they were improper. If the comments were improper, the court must consider a number of factors to determine whether the defendant was prejudiced by the comments. *Ruvalcaba v. Chandler*, 416 F.3d 555, 565 (7th Cir. 2005).

Among the factors to be considered by the court in deciding whether the defendant was prejudiced by the comments are: '(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut.' *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000). In determining whether the prosecutors' remarks were prejudicial, however, 'it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.' *Darden*, 477 U.S. at 181[]" *Ellison*, 593 F.3d at 636.

First, with regard to the comment about "choking," Petitioner has not made a case that the comment was in reference to him or anything said by defense counsel during close. In fact, the comments made by the trial court of "we all have it" followed by "okay, you may proceed" indicate it may have been some sort of cough or other issue the prosecutor was referring to. Further, defense counsel did not object, even though he did object moments later when the prosecutor commented on Petitioner's objective being to confuse the jury and not tell them the truth. Finally, appellate counsel on direct appeal did not raise this as an issue, giving further credence to the prosecutor's comment not carrying an improper import. Petitioner has not carried his burden in showing that the choking comment was an improper comment that would be implicated by *Darden*.

Next, the comments made by the prosecutor about Petitioner's not having the objective of telling the truth also did not rise to the level of a due process violation under *Darden*. First,

under the "contrary to" clause of § 2254(d)(1), the Illinois appellate court did not apply a rule that contradicted *Darden* nor did it reach a different outcome based on facts materially indistinguishable from those previously before the Supreme Court. See *Morgan*, 662 F.3d at 797. Petitioner did not cite to a U.S. Supreme Court case with facts "materially indistinguishable" from the present case where the Court reached a different conclusion. Petitioner does argue that the Illinois appellate court's determination was "contrary to" *Darden* because *Darden* was not mentioned anywhere in the appellate court's opinion. However, the Court has held that, to satisfy § 2254(d)(1), a state court is not required to cite or even be *aware* of U.S. Supreme Court cases, so long as the neither the reasoning nor the result of the state court decision contradicts them. *Early v. Packer*, 537 U.S. 3, 8 (2002). The Illinois court cited to the Illinois Supreme Court case of *People v. Jones*, 620 N.E.2d 325 (Ill. 1993), for the proposition that:

> "A court of review should reverse a verdict based upon a prosecutor's improper comments only where 'a defendant can identify remarks of the prosecutor that were both improper and so prejudicial that 'real justice [was] denied or *** the verdict of the jury may have resulted from that error.'" *Jones*, No. 04-08-0555, at 20, quoting *Jones*, 620 N.E.2d at 334, quoting *People v. Yates*, 456 N.E.2d 1369, 1385 (Ill. 1983).

Thus, the standard used by the Illinois court, requiring a finding of improper comment followed next by a finding that the remarks were so prejudicial that the verdict was in error or that real justice was denied, mirrors the requirements of *Darden*. *Darden* requires a finding that the remarks were improper, and, once found to be improper, the court must then determine if the remarks were so prejudicial and infected the trial with unfairness such that due process was

denied. *Darden*, 477 U.S. at 181. Therefore, this court cannot say that the Illinois court applied a rule that contradicted the governing law as set forth by the U.S. Supreme Court.

Nor can the court say that the Illinois court's application of the governing law was unreasonable. Under the "unreasonable application" clause of § 2254(d)(1), the court's review is limited to whether the Illinois court extended a rule to an inapplicable context or refused to extend a rule to an applicable context. See *Morgan*, 662 F.3d at 801-02. Neither of those situations is present here. Such an application of *Darden*'s principles, based on the facts before it, was not unreasonable. The context was proper and the Illinois appellate court extended to that context the appropriate governing law.

Applying the *Darden* factors, the Illinois court's decision was squarely within the bounds of reasonable jurisprudence. First, in Respondent's favor, the prosecutor did not misstate the evidence. Rather, the prosecutor commented on the objective of Petitioner's argument. Next, in Petitioner's favor, it is arguable that the prosecutor's comment implicated a specific right of Petitioner's, the right to present a defense, but the prosecutor did not comment on Petitioner's right to remain silent or right to confront the witnesses against him. Another factor in Petitioner's favor is that there is no evidence that the defense invited the improper remarks. However, in Respondent's favor, the trial court did instruct the jury, both written and orally, that closing arguments were not evidence. To be sure, the trial court should have told the jury to disregard the prosecutor's comments at the time he made them, but, as noted by Respondent, the trial court did sustain both of defense counsel's objections, and the jury heard through those objections that the comments were not proper argument. The greatest factor in Respondent's favor, however, is the weight of the evidence against Petitioner. As discussed above, the evidence against Petitioner being either the shooter or liable under an accountability theory, was

strong. Numerous witnesses testified to facts that a jury could use to directly, or via inference, implicate Petitioner in Fakes' murder. Finally, the last factor, Petitioner's opportunity to rebut, weighs in Petitioner's favor, as the remarks were made by the prosecutor during rebuttal argument. Assessing all of these factors, and noting the overwhelming nature of the evidence and that the improper comments were two sentences in a week long trial, the objections to which were sustained by the trial court, this court cannot say that the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. See *Darden*, 477 U.S. at 181.

Although the Illinois court did not go through all six of the prejudice factors one by one, the court, after discussing many of the facts in the above paragraph, concluded that irrespective of the comments, it could not say that Petitioner was denied real justice or the jury's verdict resulted from the comments. The Illinois court decision considered, and ultimately answered in the negative, *Darden*'s concern of whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. This court will not disturb the Illinois appellate court's reasonable application of the *Darden* analysis. See *Morgan*, 662 F.3d at 802.

Next, under § 2254(d)(2), Petitioner must show that the Illinois appellate court's determination of the facts was unreasonable, "'that is, lying well outside the bounds of permissible differences of opinion.'" *Morgan*, 662 F.3d at 800-01, quoting *Toliver v. McCaughtry*, 539 F.3d 766, 774 (7th Cir. 2008). "Under § 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon factfinding that ignores the clear and convincing weight of the evidence." *Morgan*, 662 F.3d at 801. Applying this deferential standard of review, the Illinois appellate court did not violate § 2254(d)(2) when it found that

there was no reasonable probability that the prosecutor's improper comments denied real justice or influenced the jury to reach a verdict it would otherwise not have reached. See *Morgan*, 662 F.3d at 801.

The Illinois appellate court's decision was not unreasonable under the facts before it. The Illinois court assumed, *arguendo*, that the prosecutor's arguments were improper. The Illinois court noted that the trial court sustained both of defense counsel's objections to the improper comments. The court further noted that, although the court did not instruct the jury to disregard the prosecutor's comments, defense counsel did inform the jury that the comments were not proper argument. The Illinois court also reasoned that there was essentially a curative instruction given by the trial court in the form of the jury instruction informing the jury that closing arguments were not evidence. The court also noted that the prosecutor's comments were brief and isolated at the beginning of rebuttal during a trial that lasted over a week and had 22 testifying witnesses. The appellate court further found that evidence of Petitioner's guilt, under either a theory of accountability or as the direct shooter, was overwhelming, and thus irrespective of the propriety of the comments, the court could not say Petitioner was denied justice or the jury's verdict resulted from the improper comments. This court does not agree with Petitioner that the Illinois appellate court engaged in an objectively unreasonable determination of the facts when it concluded that the prosecutor's improper statements did not deny Petitioner real justice or improperly impact the jury verdict. See *Morgan*, 662 F.3d at 801. Petitioner's petition is denied on this ground.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2254 Proceedings, this court denies a certificate of appealability in this case (COA). A district court may issue a COA "only if the

applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In *Barefoot v. Estelle*, 463 U.S. 880 (1983), *superseded on other grounds by* 28 U.S.C. § 2253(c)(2), the Supreme Court set forth the methodology to be used in evaluating a request for a COA. A petitioner need not demonstrate that he should prevail on the merits, but rather must demonstrate that the issues are debatable among jurists of reason, that the court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further. *Barefoot*, 463 U.S. at 893, n.4.

The court believes that Petitioner has not demonstrated that the issues raised are debatable among jurists of reason. The court would not resolve the issues in a different manner nor does it believe the questions are adequate to deserve encouragement to proceed further. Petitioner has not made a substantial showing of the denial of a constitutional right. A COA is denied.

IT IS THEREFORE ORDERED THAT:

(1) Petitioner's Petition for Writ of Habeas Corpus By a Person in State Custody Pursuant to 28 U.S.C. § 2254 (#1) is DENIED.

(2) Petitioner's Motion for Summary Judgment by Default (#3) and Motion to Request Counsel (#12) are DENIED.

(3) A Certificate of Appealability is DENIED.

(4) This case is terminated.

ENTERED this 18th day of  August , 2014.

s/ COLIN S. BRUCE

U.S. DISTRICT JUDGE